NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DAWN S., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY,

M.G., I.G., M.G., M.G., *Appellees.*

No. 1 CA-JV 19-0204

FILED 01-23-2020

Appeal from the Superior Court in Maricopa County
No. JD 30075
The Honorable Pamela Hearn Svoboda, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee, Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Michael J. Brown joined.

**C A M P B E L L**, Judge:

¶1 Dawn S. ("Mother") appeals from the superior court's order terminating her parental rights to her four youngest children ("the Children"). She argues insufficient evidence supports the superior court's findings that (1) the Department of Child Safety ("DCS") made diligent efforts to provide appropriate reunification services, and (2) termination is in the Children's best interests. Because sufficient evidence supports the superior court's findings, we affirm.

**BACKGROUND**

¶2 Mother has eight children, but only the four youngest are the subject of the current appeal: M.G., born in 2012; I.G., born in 2014; M.G., born in 2015; and M.G., born in 2016. DCS filed a dependency petition regarding Mother's seven older children in March 2015, before the youngest child was born. DCS alleged the children were dependent due to Mother's abuse and/or neglect. Based on Mother's successful participation in services, however, the court dismissed the petition in June 2015.

¶3 Approximately a year and a half later, DCS received reports that Mother was neglecting the Children's mental health and educational needs. DCS also discovered that one of the older children had committed multiple acts of sexual abuse, including acts against his three-year-old sister, but continued to reside in Mother's home with his younger siblings. Based on this new information, DCS filed a second dependency petition in November 2016, asserting that Mother: (1) was unable or unwilling to provide for the Children's mental and behavioral health needs; (2) failed to protect the Children from sexual abuse; and (3) neglected the Children due to substance abuse.

¶4 When Mother gave birth to her eighth child, the baby tested positive for THC in the hospital. Because the child was born substance-exposed, DCS amended the dependency petition to include allegations that Mother failed to treat her own mental health issues and exposed the

Children to domestic violence and physical abuse. In March 2017, the court adjudicated the Children dependent.

¶5 Initially, the Children remained in the home with Mother. But Mother refused to participate with family preservation program services, and DCS subsequently moved for a change in physical custody. The court granted the motion and the Children were removed from Mother's care in May 2017.

¶6 After the Children were removed, DCS offered Mother supervised visitation, a parent-aide, and therapeutic visitation. DCS also provided Mother referrals for both psychiatric and psychological evaluations, domestic violence counseling, Ph.D-level counseling with an EMDR (Eye Movement Desensitization and Reprocessing) component, trauma counseling, and parent-aide skills classes, as well as access to mental health medications and transportation services. Mother only participated in the offered services sporadically, however, or not at all.

¶7 In October 2018, DCS moved to terminate Mother's parental rights to the Children based on Mother's mental illness and the length of the Children's out-of-home placement. After holding a three-day contested severance hearing, the superior court found that: (1) DCS had proven each statutory ground for termination, (2) DCS had made diligent efforts to provide Mother with reunification services; (3) Mother was unable to remedy the circumstances that caused the Children to be taken into care; and (4) termination was in the Children's best interests. Mother timely appealed.

## DISCUSSION

¶8 "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, (2005) (citations omitted). Even fundamental rights are not absolute, however. *Id.* (citation omitted). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance and finds by a preponderance of the evidence that severance is in the children's best interests. *See* A.R.S. §§ 8–533(B), –537(B).

¶9 The superior court is entrusted with a great deal of discretion in weighing and balancing the interests of the children, parents, and State. *Cochise Cty. Juv. Action No. 5666–J*, 133 Ariz. 157, 160 (1982). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

We will not disturb the court's termination of parental rights unless the factual findings are clearly erroneous—that is, unless no reasonable evidence exists to support them. *See Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 78–79, ¶ 9 (App. 2001). Instead, we interpret the evidence and reasonable inferences in the light most favorable to affirming the court's order. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008).

## I.      Fifteen Months Out-of-Home Placement[1]

**¶10**          Pursuant to A.R.S. § 8-533(B)(8)(c), the superior court may terminate parental rights on the grounds of a fifteen-months or longer out-of-home placement if DCS has made diligent efforts and the parent has been unable to remedy the circumstances that caused the children to be placed in out-of-home care.  At the time of the termination hearing, the Children had been in an out-of-home placement for 24 months.

### A.      Diligent Efforts to Provide Reunification Services

**¶11**           Mother argues DCS failed to make diligent efforts to provide appropriate reunification services. Specifically, Mother contends that based on the results of her psychological assessment, she needed more intensive psychological treatment such as Ph.D.-level therapy, inpatient or day-program intensive therapy, and medication management services. Mother asserts that without these services, DCS failed to meet its burden of proving it diligently provided reunification services. We disagree.

**¶12**          DCS satisfies its obligation to make diligent and reasonable efforts to reunify by providing a parent "with the time and opportunity to participate in programs designed to help [Mother] become an effective parent." *Maricopa Cty. Juv. Action No-JS-501094*, 180 Ariz. 348, 353 (App. 1994). To meet its obligation, DCS need not provide every conceivable service or  force Mother to participate in the services offered. Stated differently, "[t]he State is not obligated to undertake futile rehabilitative measures . . . [only] those which offer a reasonable possibility of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 187, ¶ 1 (App. 1999).

---

[1] "If clear and convincing evidence supports any one of the statutory grounds on which the [superior] court ordered severance [of parental rights], we need not address claims pertaining to the other grounds." *See* A.R.S. § 8–533; *Jesus M. v. Arizona Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).

Parents also have an affirmative duty to engage in services in a timely, consistent manner. *Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994).

¶13        At the hearing, a DCS case supervisor testified that Mother had twice been scheduled to complete a psychiatric evaluation but failed to attend either appointment, and the referral was closed out. She also explained that Mother never completed the intake for domestic violence counseling and was therefore discharged unsuccessfully from the program. Although Mother was referred to EMDR Therapy, after hostile interactions, the provider eventually refused to provide services. Over a year later, Mother was re-referred for a psychiatric evaluation, which she attended. During the evaluation, Mother disclosed that her anxiety and paranoid personality disorder began two years prior.  After the exam, mother refused to sign any forms for consent to treatment, including medication.

¶14        The DCS supervisor further explained that Mother completed a psychological evaluation, but when DCS attempted to implement the mental health treatment recommendations, Mother refused to attend the intake appointments necessary to initiate services. Eventually, Mother arranged for mental health services through her own provider and authorized the provider to release information to DCS. However, Mother later revoked that authorization and  the records were subsequently made available only through a court order. Those records confirmed that Mother had discontinued therapy. After DCS learned Mother had discontinued counseling with her own provider, another Ph.D.-level counseling referral was provided. Mother again began therapy, but she refused to follow the provider's recommendations and discontinued therapy three months later.

¶15        Mother participated in visitation supervised by a case aide, but she had difficulty appropriately interacting with the Children during visits. To address Mother's challenges, the Children were separated into older and younger groupings to decrease the need for divided attention. The separation did not alleviate the problems with Mother's inability to appropriately supervise the Children. Because Mother consistently cancelled her sessions for the skills-building portion of the parent aide program, and due to ongoing concerns about the Children's safety and well-being, therapeutic visitation was recommended, and parent aide services were terminated.  After Mother received this referral, she waited three months to complete the intake evaluation required to begin therapeutic visitation.

¶16 As the DCS caseworker testified, Mother was offered a series of mental health services intended to help her become an effective parent, but Mother only participated sporadically, if at all. Mother chose not to take full advantage of the services made available to her. Therefore, reasonable evidence supports the superior court's diligent-efforts finding.

### B. Failure to Remedy the Circumstance Causing the Children to be Placed in Care

¶17 Apart from Mother's unwillingness to fully engage in treatment, the superior court expressed concern about her lack of insight into her mental illness. After more than two years of sporadic attempts at mental health treatment, Mother still refused to acknowledge that she has mental health issues and that her mental illness impacts her ability to safely parent the Children. One of the evaluating psychologists, Dr. Loeb, testified that Mother's "paranoia and delusions have only gotten worse," despite receiving some treatment. Dr. James Thal, another psychologist who conducted a psychological evaluation of Mother, testified that "additional [reunification] services would be futile" in light of Mother's "blatant[] resistan[ce]" to counseling services, refusal to consider medication, and diagnosis of paranoid personality disorder. Given this evidence, the court found that further services from DCS would be futile, Mother failed to remedy the circumstance causing the Children to be taken into DCS care, and she would not be able to remedy them in the near future. The record supports that finding.

## II. Best Interests

¶18 Mother argues insufficient evidence supports a finding that the Children would benefit from termination or that the Children would be harmed if her rights were left intact.

¶19 Termination of parental rights is in the children's best interests if termination would benefit the child or if continuation of the relationship would harm the child. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 9 (App. 2018) (internal citation omitted). Once the court's focus shifts to the best interests analysis, the "foremost concern . . . is protecting a child's interest in stability and security." *Id.* The superior court also considers whether the current placement is meeting the children's needs and whether the placement wants to adopt the children. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (internal citations omitted). Generally, it is in the best interests of the children for the parent

to have a finite window of opportunity for remediation. *Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. at 577.

**¶20** Here, reasonable evidence supports the superior court's finding that termination is in the Children's best interests. The Children have already been in an out-of-home placement for two years. Dr. Thal testified that even if Mother began a "fairly straightforward progression through services," including taking medication, it would probably take over a year before Mother showed appreciable improvement. The DCS supervisor added that severance would benefit the Children, and that continuing the parental relationship would be a detriment to the Children because termination would promote a "safe, stable, consistent environment" by legally freeing the Children to "pursue adoption in that type of a placement." All four Children were in adoptive placements which were meeting their needs and willing to adopt Mother does not dispute this evidence.

**¶21** The only evidence presented to the contrary is Mother's own testimony. She explained that she provided an environment where she met the Children's medical, emotional, and educational needs. She also opined that she never abused or neglected the Children. When there is a conflict in the evidence, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We will not reweigh evidence, but rather we view all evidence and reasonable inferences therefrom in the light most favorable to affirming the court's order. *Jordan C.*, 223 Ariz. at 93.

**¶22** The superior court found that termination would be in the Children's best interests by a preponderance of the evidence. This finding was within the court's discretion and is supported by credible evidence.

**CONCLUSION**

¶23        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:      HB